IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 22, 2020 Session

## BRUCE GILLAM v. DESTINY BALLEW

**Appeal from the Circuit Court for Anderson County**
**No. B6LA0172     M. Nichole Cantrell, Judge[1]**

---

### No. E2018-01782-COA-R3-CV

---

This appeal concerns the trial court's designation of the father as the minor children's primary residential parent after establishing his paternity. During trial, the court granted the father's motion in limine to exclude testimony from the mother's expert witness. The mother appeals the trial court's evidentiary ruling and the designation of primary residential parent. We affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Shelley S. Breeding, Nancyjane B. Sharp, and Madeline S. Copes, Knoxville, Tennessee, for the appellant, Destiny Ballew.

Lauren R. Biloski and Channing R. Miller, Clinton, Tennessee, for the appellee, Bruce Gillam.

## OPINION

### I.     BACKGROUND

The Children, Jacob ("Son") and Bailey ("Daughter") were born out-of-wedlock to Appellant Destiny Ballew ("Mother") and Appellee Bruce Gillam ("Father") in 2003 and 2008, respectively. The parties met in Illinois and began dating in 2001. They briefly lived in Father's home state of New York, and again in Illinois where Son was born. After Son's birth, and for the majority of the time that they were an unmarried

---

[1] Sitting by interchange.

couple, Mother, Father, and the Children resided in Tennessee. Mother and Father broke up in March 2010. Father lost his job that same year. Father voluntarily left the home and moved to New York to live with his mother, leaving Mother as the Children's primary caretaker.

In April 2010, with Father's consent, Mother transferred custody to the maternal grandmother for a short period while she completed training for the Navy Reserves. Custody was returned to Mother once she returned from training. From 2010 to 2015, Father paid no child support. Before 2015, there was no child support order in place, nor had Mother requested child support payments. Nevertheless, Father knew that he was responsible for supporting the Children. In April 2015, Mother initiated child support judicial proceedings, but stopped them because Father could not afford to pay the projected amount of child support. Mother did not want Father to go to jail for failure to pay. Upon their agreement, Father paid Mother one hundred dollars weekly child support until he was granted custody of the Children in August 2016. Father visited the Children beginning in the summer of 2011 when he had the Children for approximately ten weeks of the year. In the summer of 2014, Mother gave him two hundred dollars so he would have the funds to visit the Children.

The record contains the maternal grandfather's ("Grandfather") testimony. Grandfather is an admitted alcoholic who has a cocaine-related drug conviction and a conviction for a sexual offense against a minor, for which he served jail time. Grandfather is listed on the Tennessee Sexual Offender Registry and is not to have contact with minor children. He has been arrested for "staying where [he] wasn't supposed to stay for more than 48 hours," a Registry violation. Years ago, Grandfather placed his penis on a twelve-year-old girl's face and consequently pled guilty to attempted sexual assault of a minor.

One to two times per month, Grandfather would visit Mother's home, drink to the point of being too intoxicated to drive, and spend the night while the Children and their minor stepsister were in the home. In January 2016, Daughter disclosed an instance of sexual abuse recently perpetrated by her Grandfather. In January 2016, Grandfather was allowed to sleep on the couch in Mother's home with Daughter. The parties agree that Grandfather sexually assaulted their Daughter at that time. Daughter initially told Mother that Grandfather inappropriately rubbed her over her clothing. Mother did not report this act to the police, the Tennessee Department of Children's Services ("DCS"), Father, or her husband, Christopher Ballew, whose minor daughter also resided in the home. Mother refused further contact with Grandfather. Mother's reasoning for not immediately reporting Grandfather's abuse of her Daughter was that Daughter, then seven years old, did not want to tell the police. Mother believed she acted appropriately

under the circumstances because she removed Grandfather from her home and did not allow him to have any further contact with the Children.

In March 2016, Daughter disclosed to Mother a new version of the events between her and her Grandfather, stating that Grandfather had pulled her pants partially down. Mother then contacted an acquaintance who was a former DCS employee. Based on the acquaintance's advice, Mother took Daughter to DCS on March 7, 2016. On March 9, 2016, Mother called DCS and reported Daughter's sexual abuse allegations against Grandfather. In early March 2016, Daughter disclosed Grandfather's sexual abuse of her to her Father. Father immediately phoned Mother to discuss, notified the police, and contacted DCS. Mother confirmed the allegations to Father. Around this time, Mother's husband was notified of the abuse. He went to Grandfather's home armed with a gun, but Grandfather was not home. DCS later substantiated Daughter's sexual abuse allegations and conducted a home visit. Daughter was permitted to stay in the home because Mother had excised Grandfather from their life. According to Mother, Father then began repeatedly calling Daughter to question her about the abuse, forcing her to relive the events. Mother refused any further direct telephone contact between them by blocking Father's number from the Children's phones.

This litigation commenced on March 18, 2016, upon Father's filing a petition to establish paternity for custody and a proposed temporary parenting plan in the Juvenile Court for Anderson County, Tennessee. The same day, the juvenile court ordered that "[Mother] and her agents shall ensure the minor children have no contact either in person, through third parties, or via telephone or social media, with [Grandfather]." On March 31, 2016, Mother answered the petition and filed a counter-complaint to establish child support. On April 4, 2016, DCS filed a petition for a restraining order against Grandfather on behalf of the Children. In its petition, DCS stated that Child Protective Services became involved in this case on or about March 7, 2016, due to Daughter's allegations of sexual abuse. DCS further alleged that Daughter "made consistent disclosures" of Grandfather's sexual abuse of her that had "happened about 5 or 6 times, usually at night when her grandfather spent the night at her home." The restraining order was confirmed.

On May 10, 2016, Father filed a proposed permanent parenting plan order requesting custody of the Children. Father moved for an immediate entry of order for summer vacation on May 23, 2016. In his motion, Father alleged that despite the parties' earlier agreement that the Children would spend the summer with him, after he filed the petition to establish paternity for custody, Mother refused to discuss or arrange summer visitation until the parties attended mediation. A mediation date had been scheduled, but it was cancelled and not reset after mother obtained new counsel. This issue was

resolved through an agreed temporary order wherein Father was granted co-parenting time with the Children from May 28, 2016, to July 16, 2016.

By order entered June 28, 2016, the juvenile court found that Grandfather sexually abused Daughter and that Daughter was the victim of severe child abuse as that term is defined in Tennessee Code Annotated section 37-1-102. The juvenile court also ruled that the no contact order between Grandfather and the Children would extend until they reached age 18.

The case proceeded to a hearing before the juvenile court in August 2016. On September 6, 2016, the juvenile court entered its order awarding custody of the Children to Father, named him primary residential parent, and entered a permanent parenting plan. Mother appealed to the Circuit Court for Anderson County ("the trial court").[2]

Father resides in New York with his wife and her three sons. During the pendency of the appeal to the Circuit Court, Daughter disclosed an instance of inappropriate touching by her stepbrother while in Father's custody in New York. Father immediately reported the allegation to the appropriate authorities and to Mother, but did not remove the stepbrother from the home. Father also placed an alarm on Daughter's bedroom door, set a rule that no other children in the home were allowed in Daughter's bedroom, nor was she allowed in their bedrooms, and ensured that the Children were not left unsupervised. Following an investigation, the allegation against the stepbrother was deemed unfounded. The door alarm is no longer in use.

On January 17, 2017, Mother filed a motion for psychological evaluation and for forensic medical evaluation, pursuant to Tennessee Rule of Civil Procedure 35.01. Following a hearing, the trial court found that "the mental and physical condition of [Daughter] is in controversy," and that "[Son's] mental state, too, is called into question pursuant to Rule 35." For these reasons and for good cause shown, the trial court ordered the Children to "be evaluated by a psychologist chosen by the Mother and that any other individuals in the Mother's household or the Father's household shall be evaluated as requested by the psychologist" at Mother's expense. On October 2, 2017, Father filed a motion in limine to bar the psychologist, Dr. Bashkoff, from testifying or referring to the evaluation she performed. Father argued that Dr. Bashkoff had conducted a forensic custodial evaluation instead of a psychological evaluation, as ordered, and that he did not consent to a forensic custodial evaluation. Following a hearing, and by order entered November 20, 2017, the trial court found that it had previously ordered Dr. Bashkoff "to conduct a psychological evaluation pursuant to Rule 35 of the Tennessee Rules of Civil Procedure of the parties' minor children and any other members of either family should

---

[2] The parties signed an agreed order that Chancellor Cantrell would sit by interchange for the Judge of the Circuit Court for Anderson County.

she request." The court further found "[t]hat a forensic custodial evaluation was not ordered." The court ordered that if Dr. Bashkoff had not completed a psychological evaluation of the Children, then she should do so, and further ordered "[t]hat if the testimony during the trial in this matter demonstrates that [Father] and members of his household consented to the forensic custodial evaluation, then the results of the evaluation could be admissible despite not being Ordered."

The case proceeded to a seven-day bench trial held on December 6, 7, and 8, 2017, and on August 13, 14, 15, and 16, 2018.[3] On the last day of trial, Father renewed his October 2, 2017, motion in limine. Following the parties' lengthy argument on the record, the trial court granted Father's motion, so Dr. Bashkoff was not permitted to testify. The trial court granted Mother's request to present Dr. Bashkoff's testimony as an offer of proof, outside of the trial judge's presence. By final order entered September 4, 2018, the trial court designated Father as the Children's primary residential parent and adopted Father's proposed permanent parenting plan. The court further ordered that Mother would be responsible for paying child support and that the Juvenile Court's order preventing Grandfather from contacting the Children would remain in effect.

## II.    ISSUES

We consolidate and restate the issues on appeal as follows:

A.      Whether the trial court abused its discretion by excluding the testimony of Mother's expert witness, Dr. Bashkoff.

B.      Whether the trial court erred by designating Father as the primary residential parent.

## III.    STANDARD OF REVIEW

We review a trial court's factual findings de novo upon the record, with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review a trial court's conclusions of law de novo with no presumption of correctness. *Id*. A trial court's decision regarding a parenting arrangement is reviewed for abuse of discretion. *In re Noah J.*, No. W2014-01778-COA-R3-JV, 2015 WL 1332665, at *3 (Tenn. Ct. App. Mar. 23, 2015). Our Supreme Court has explained:

---

[3] The testimony will be further outlined below as relevant to the issues on appeal.

Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge.' *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). 'It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court.' *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* 'An abuse of discretion occurs when the trial court ... appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.' *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule 'only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.' *Eldridge*, 42 S.W.3d at 88.

*Armbrister*, 414 S.W.3d at 693. The abuse of discretion standard "does not permit an appellate court to substitute its judgment for that of the trial court, but 'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives.'" *Gonsewski*, 350 S.W.3d at 105 (citations omitted).

## IV.   DISCUSSION

### A.

Evidentiary rulings fall "within the trial court's discretion." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222 (Tenn. Ct. App. 1999). As discussed in *White*:

The discretionary nature of the decision does not shield it completely from appellate review but does result in subjecting it to less rigorous appellate scrutiny. Because, by their very nature, discretionary decisions involve a

choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen.

*Id.* at 222-23 (citations omitted). We review the trial court's discretionary decision to determine: "(1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principles, and (3) whether the trial court's decision is within the range of acceptable alternatives." *Id.* at 223. "Appellate courts should permit a discretionary decision to stand if reasonable judicial minds can differ concerning its soundness." *Id.*

Mother argues that the court abused its discretion by barring Dr. Bashkoff from testifying because Father "signed the consent for [the] Doctor's evaluation which was conducted solely to provide expert testimony." Father argues that Dr. Bashkoff's evaluation differed from what the trial court previously ordered and was properly excluded on that basis.[4] The trial court considered these arguments:

> Mother's Trial Counsel: Before [Dr. Bashkoff's] report was done, before anything began, [Father] signed [the consent form]. And it says, "I have been asked to conduct a psychological assessment of you in connection with your legal case. This form was written to give you information about this assessment. This release is for the sole purpose of facilitating a forensic psychological evaluation." Forensic evaluation is just that, a custody evaluation. It's the same thing. You go ask any—
>
> Trial Court: Let me interrupt you. No, they're not.
>
> Mother's Trial Counsel: Yes, they are.
>
> Trial Court: Absolutely not. A forensic psychological evaluation of the children is not the same thing as a forensic custody evaluation where we have an expert come in and give an expert opinion regarding who is the best custodian for the children. They are not the same thing. A psychological evaluation, or a psychological assessment of the children, would have an expert come in and talk about the psychological well-being of the children and what their current conditions are. It would not contain in it any expert opinions regarding custody.

---

[4] By order entered November 20, 2017, the trial court found that it had previously ordered Dr. Bashkoff "to conduct a psychological evaluation pursuant to Rule 35 of the Tennessee Rules of Civil Procedure of the parties' minor children and any other members of either family should she request." The court further found "[t]hat a forensic custodial evaluation was not ordered."

Mother further argues that the trial court erred by refusing to exclude only the portions of Dr. Bashkoff's testimony and report pertaining to custodial opinion.[5]  Mother contends that the complete bar of Dr. Bashkoff's testimony "was fatal to her case."

Based on our reading of Dr. Bashkoff's testimony in the offer proof in conjunction with the entire record and the trial court's final order, we cannot agree that its exclusion was "fatal" or that the testimony would have been as "pivotal" as Mother contends.  More importantly, Mother has not shown that the trial court abused its discretion in making the evidentiary ruling.  The record contains the trial court's factual basis and the applicable legal principle.  Namely, the trial court reiterated to the parties through its November 20, 2017, order that a forensic custodial evaluation was neither contemplated nor authorized, and reasoned during argument on the motion in limine that "[n]othing in Rule 35 contemplates that the examination that is going to be done is a custody examination." Although Dr. Bashkoff's testimony could have been limited, the trial court's ruling on Father's motion in limine fell within the range of acceptable alternative rulings. Therefore, we must affirm.

B.

Pursuant to Tennessee Code Annotated section 36-6-404(a), any final decree in an action for separate maintenance involving a minor child shall incorporate a permanent parenting plan, defined in Tennessee Code Annotated section 36-6-402(3) as "a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a residential schedule, as well as an award of child support[.]".  The trial court is charged with determining a residential schedule, which defines one party as the primary residential parent and designates in which parent's home the child will reside on given days during the year.  Tenn. Code Ann. § 36-6-402(5).  Additionally, Tennessee Code Annotated section 36-6-401(a) provides, in pertinent part:

> The general assembly recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests.  The best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care.

---

[5]  In the offer of proof, Dr. Bashkoff opined that she saw "no reason" why the Children should not reside with Mother, and that Mother was best suited to care for the Children because Father "doesn't understand the spirit of coparenting."

When developing a parenting plan, the court should consider the factors set forth in Tennessee Code Annotated section 36-6-106(a). These factors are as follows:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's [] past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents [] to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents [] to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent [] to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent [] denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . .;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement

with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. . . .;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a)(1)-(15). Although the court is obligated to consider the applicable statutory factors, "the statute does not require a trial court, when issuing a memorandum opinion or final judgment, to list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination." *Burnette v. Burnette*, No. E2002-01614-COA-R3-CV, 2003 WL 21782290, at \*6 (Tenn. Ct. App. July 23, 2003).

Here, after hearing seven days of testimony, the trial court reviewed the relevant factors in detail and found that they weighed in favor of naming Father primary residential parent. In making its decision, the trial court considered Mother's testimony that she did not report Daughter's first disclosure of sexual abuse perpetrated in Mother's home by Grandfather because Daughter, then seven years old, did not want to tell the police. The trial court found this reasoning "unacceptable and an example of [Mother] failing to act in the best interest of her minor child which this court considers a factor to be taken into consideration under T.C.A. § 36-6-106(a)(15)." On the other hand, the trial court found that when Daughter disclosed inappropriate touching by her stepbrother, Father "acted immediately, appropriately, and in [Daughter's] best interest even if, as he testified, he may not have believed the allegation when [Daughter] disclosed it to him."

The trial court found it relevant that in the discussion between Mother and Father regarding what actions Mother had taken upon hearing their Daughter's allegations of sexual abuse, Mother lied to Father about the steps she had actually taken. The trial court cited Mother's testimony that she told Father she had a restraining order in place, when she did not. She indicated to Father that Grandfather was going to be arrested when there was no basis for that statement because Mother had yet to report the abuse to the police or to DCS. Tenn. Code Ann. § 36-6-106(a)(15).

Under Tennessee Code Annotated section 36-6-106(a)(1), the trial court appropriately considered that, until August 2016, Mother had performed the majority of parenting responsibilities relating to the daily needs of the children. However, several other factors weighed in the court's decision. For example, the trial court considered the text messages between the parties which indicated Mother "was livid with [Father] for notifying the police" about Grandfather's sexual abuse of Daughter, and considered Mother's actions following Father's report and his filing of the original petition:

> Also, under the second factor of T.C.A. § 36-6-106 is the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship with the other parent. Here, the court may consider any history of either parent denying parenting time to either parent in violation of a court order. [Mother] has shown an unwillingness or inability to encourage a continuing relationship between the children and the [Father]. . . . Taking retaliatory actions such as blocking [Father's] access to the children via telephone and social media is a factor to be considered. In addition, when making the children available for phone contact with [Father], having the set time at 6:00 a.m. appears to this court as another effort to interfere with [Father's] contact with the children. Again, after the initial pleadings were filed by [Father], [Mother] attempted to deny [Father] his summer visitation with the minor children.
>
> [Mother] argued that [Father] had acted in a similar manner by denying [her] request for Fall Break, (which the children do not have in the New York school system) to be taken during a February winter break. This was not pursuant to the language of the Parenting Plan and the matter was ruled on by this court on the 6th day of February, 2017. [Father] ensures that the children have telephone contact with [Mother] and encourages the children to call her.

Tenn. Code Ann. § 36-6-106(a)(2).

Additionally, the trial court considered Father's demonstrated "potential for future performance of parenting responsibilities" based on evidence that "[Daughter] is receiving the necessary counseling while in his care," his "active role in the children's schooling," and the Children's improvement in school after an initial struggle. Tenn. Code Ann. § 36-6-106(a)(2). The trial court specifically rejected the notion "that the children are doing substantially worse in school in New York than they did under [Mother's] care in Tennessee," and found that a change in schooling "does not in itself constitute a reason to return the children to [Mother's] care."

The third factor did not apply in this case. As to the fourth factor, the trial court found that:

> Each parent has shown the disposition to provide the child with food, clothing, and education; however [Mother] did not seek out any medical care immediately after the disclosure of sexual abuse to ensure that the abuse did not include penetration. There have been ongoing issues between these parents regarding necessary counseling and dental care. [Mother] has not given her permission for the Children to receive recommended dental care, such that [Father] has not been able to act. In addition, [Mother] demanded a change in the counselor treating [Daughter] in New York due to some issue [Mother] had with the counselor, not whether it was in [Daughter's] best interest to continue with this counselor whom she was established and comfortable with.

Tenn. Code Ann. § 36-6-106(a)(4). In weighing the fifth factor, the trial court acknowledged "there is no question that for the majority of the time since the parties separated in 2010, [Mother] has been the primary caretaker of the children." Tenn. Code Ann. § 36-6-106(a)(5). The trial court found that "both parties have love, affection, and emotional ties with the children." Tenn. Code Ann. § 36-6-106(a)(6). As to the seventh factor, the emotional needs and developmental level of the child, the trial court noted its "concerns relating to the stance [Mother] took after [Daughter] made the disclosure of sexual abuse," including Mother's initial non-reporting, the fact that Mother waited some time before considering counseling for Daughter, and Mother's statement to Father that he needed to stop Daughter from discussing the abuse with him when she brought it up in conversation. The trial court found that Father "does seem to have the emotional needs of [Daughter] in mind, ensuring that [she] is receiving counseling while in his care." Tenn. Code Ann. § 36-6-106(a)(7). Under the eighth factor, the court found that the "moral, physical, mental and emotional fitness of either parent is not an issue in this case." Tenn. Code Ann. § 36-6-106(a)(8).

The trial court recognized that the Children have relationships with their stepsiblings and stepparents in New York and in Tennessee, but also considered that a member of Mother's family, who was staying in her home with permission, sexually abused Daughter. Tenn. Code Ann. § 36-6-106(a)(9). As the trial court noted, Mother and her husband, Christopher Ballew, both testified that they believed Grandfather's story that his criminal convictions were due to an act of revenge by an ex-girlfriend, and both testified many times that there were no "red flags" to alert them that having Grandfather in their home posed a danger. In rejecting this proposition, the court posited, "[w]hat else could have put [Mother] on notice other than her knowledge of [Grandfather's] conviction, her knowledge of his listing on the sex offender registry [], her knowledge that [he] was not to be around children, and her knowledge that he was heavily intoxicated while staying at her home?" The trial court "heavily weighed" these facts "under factor[s] nine, eleven and twelve." Tenn. Code Ann. § 36-6-106(a)(9), (11), (12).

In considering the importance of continuity in the Children's lives, the trial court balanced the fact that, at the time, the Children had lived with their Mother "for the majority of their lives," with Son's testimony that he made friends in New York, had a good relationship with his family in New York, and was happy in the residence with Father. Tenn. Code Ann. § 36-6-106(a)(10). Son did not state a preference in his testimony, and Daughter did not testify. Tenn. Code Ann. § 36-6-106(a)(13). The fourteenth factor did not weigh in the court's analysis, although the court found that "[b]oth parents are employed and both parents' schedules are suitable to provide for the children." Tenn. Code Ann. § 36-6-106(a)(14). Taking all the above factors into consideration, the trial court concluded "that it is in the best interest of the minor children to remain in the care and custody of [Father], and to adopt [Father's] proposed parenting plan setting forth co-parenting time with [Mother]."

On appeal, Mother argues that the trial court's designation of Father as the primary residential parent did not serve the Children's best interests. She asserts that "when accurately and wholly assessed," the majority of the statutory factors weigh in favor of her comparative fitness, not Father's. She argues that the court erroneously focused on her failure to immediately report the sexual abuse and her refusal to permit direct telephone contact between Father and the Children. She claims that the court overlooked the fact that Father did not remove stepbrother from his home in light of Daughter's allegations, and that she only limited contact for Daughter's emotional wellbeing. Mother repeatedly notes that she provided the majority of care, support, and affection for the Children from 2010 to August of 2016 because Father lived elsewhere, but argues that the trial court "fail[ed] to emphasize" and "failed to give . . . any credit" for this. Mother apparently misreads the trial court's order wherein the court considered throughout that Mother was the Children's primary caretaker for several years.

Overall, Mother appears to ask us to reevaluate the facts heard by the trial court and simply reach a different conclusion. Appellate courts are hesitant to second-guess a trial court's custody and visitation decision because these decisions "'often hinge on subtle factors, including the parents' demeanor and credibility.'" *Lower v. Lower*, No. M2013-02593-COA-R3-CV, 2014 WL 5089346, at *4 (Tenn. Ct. App. Oct. 8, 2014) (quoting *Hyde v. Bradley*, No. M2009-02117-COA-R3-JV, 2010 WL 4024905, at *3 (Tenn. Ct. App. Oct. 12, 2010)). After extensively reviewing the record, we agree with the trial court's findings. The evidence presented at trial and the entirety of the record wholly support the findings. Mother has not demonstrated that the trial court abused its discretion in conducting its best interest analysis, and we find that the evidence does not preponderate against the trial court's findings on any of the factors the court considered. We hold that the trial court's conclusion that it is in the Children's best interests for Father to be the primary residential parent is within "the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88. Accordingly, we affirm the trial court's judgment.

## V. CONCLUSION

We affirm the decision of the trial court. The case is remanded for such further proceedings as may be necessary and consistent with this Opinion. Costs of the appeal are taxed to the appellant, Destiny Ballew.

_____
JOHN W. McCLARTY, JUDGE

- 14 -